Filed 4/19/23  In re M.M. CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| In re M.M., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B319031 (Super. Ct. No. MJ24144) (Los Angeles County) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>M.M.,<br><br>    Defendant and Appellant. | |

M.M. appeals from an order adjudicating him a ward of the court after it sustained allegations he committed second degree murder (Pen. Code, § 187; count 1) and vehicular manslaughter with gross negligence (Pen. Code, § 192, subd. (c)(1); count 2;

Welf. & Inst. Code,[1] § 602).  The court ordered M.M. committed to a secure youth treatment facility (SYTF) with a baseline term of six years and six months and a maximum term of confinement of 15 years to life.

M.M. contends (1) there was insufficient evidence to support the true finding on murder, and (2) the juvenile court abused its discretion when it committed him to SYTF.  We affirm.

FACTUAL AND PROCEDURAL HISTORY

While on patrol, two Los Angeles County Sheriff's deputies saw a burgundy sports utility vehicle (SUV) pull out of a parking lot.  M.M. was driving the SUV.  The deputies conducted a warrant inquiry on the license plate and learned the SUV was connected to a recent burglary.

The SUV entered a freeway, and the deputies followed. While driving in the center lane, the SUV made an abrupt right turn in front of another car and crossed a lane of traffic to exit the freeway.  The deputies activated their lights and sirens and continued to follow the SUV.  The SUV sped up, ran a red light without slowing down, and weaved in and out of traffic, nearly colliding with several other vehicles on the road.  M.M. was driving about 100 to 110 miles per hour.  At one point, the deputies stopped their pursuit of M.M. due to public safety concerns.

There were four other people in the SUV.  One of the passengers testified that all the passengers screamed at M.M. to stop the car.  M.M. screamed "no" and drove faster.

The SUV sped through another red light and made a fast right turn onto another street.  The deputies saw a "big cloud of

_____

[1] Further unspecified statutory references are to the Welfare and Institutions Code.

2

dust" when they approached the street.  The SUV was flipped on its side in the bike path and had hit a nearby brick wall.

The deputies walked in front of the SUV and saw the body of V.R. in the bike lane; the SUV had hit and killed V.R.  Her body was split into two at the abdomen.

A detective arrived on scene and saw M.M. crawl out of the sunroof of the SUV.  M.M. said, "kill me, kill me."  The detective placed M.M. in the backseat of a patrol car and checked to see if he was injured.  M.M. said he was "not okay" and that "his life was over."  He repeatedly said that "he believed he killed somebody and that he had cut her in half."  The detective advised M.M. of his *Miranda*[2] rights and questioned him.  M.M. admitted to driving the SUV and fleeing from the deputies because he was scared.

M.M. was taken to a hospital and a deputy advised him of his *Miranda* rights.  The deputy asked: "Did you know driving in a reckless manner can put people's lives in danger?  Were you aware of that?"  M.M. replied: "Yes, sir."  The deputy also asked: "[D]id you know that you could have possibly got into a car accident and possibly seriously injured somebody.  Did you know that?"  M.M. replied: "Yes, sir."  Later, the deputy asked M.M.: "So, before the car accident happened, before any collision happened . . . did you know that driving recklessly could have seriously hurt somebody?"  M.M. responded: "Yes, sir."

A deputy investigating the crash site observed the speed limit was 55 miles per hour.  Based on measurements of the area and skid marks at the scene, a detective opined the SUV was

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

traveling at about 105 miles per hour when the driver lost control and the SUV began to skid.

## DISCUSSION

### *Sufficiency of the evidence*

M.M. contends the true finding for murder must be reversed because there was insufficient evidence he acted with implied malice. We disagree.

We review the trial court's true finding for substantial evidence. We review "the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*In re Sylvester C.* (2006) 137 Cal.App.4th 601, 605.) " 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. [Citation.]' [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 943.)

Murder is the unlawful killing of a human being with malice aforethought. (Pen. Code, § 187, subd. (a).) Malice is implied when the circumstances of the killing show it was done with an "abandoned and malignant heart." (Pen. Code, § 188, subd. (a)(2).) Malice may be implied when the defendant acts with wanton disregard of the high probability of death. (*People v. Fuller* (1978) 86 Cal.App.3d 618, 628 (*Fuller*); *People v. Moore* (2010) 187 Cal.App.4th 937, 941 (*Moore*).) A vehicular homicide may be prosecuted as second degree murder where the facts support a finding of implied malice. (*People v. Watson* (1981) 30 Cal.3d 290, 298-299.) The facts must demonstrate the defendant had a subjective awareness of the risk because "the defendant *actually appreciated* the risk involved." (*Id.* at p. 296-297.) It is

4

not enough that a reasonable person would have been aware of the risk. (*Ibid*.)

Here, substantial evidence supports the juvenile court's finding that M.M. acted with implied malice. M.M. led deputies on a high-speed chase while endangering other vehicles and people on the road. He abruptly changed lanes on the freeway, ran through multiple red lights, and weaved in and out of traffic, almost hitting other vehicles on the road. He ignored the pleas from his passengers to stop the vehicle, and instead increased his speed. M.M. drove about 100 miles per hour in a 55 mile-per-hour zone. At that speed, M.M. tried to make a right turn, resulting in him losing control of the vehicle and striking V.R. with such speed and force that the collision split her body into two. Additionally, M.M. admitted to a deputy that even before the collision, he was aware that driving in such a reckless manner could put people's lives in danger. In sum, this evidence supports the court's finding that M.M. appreciated the risk of his actions.

This case is similar to *Moore*, *supra*, 187 Cal.App.4th 937, in which we upheld a conviction for second degree murder. There, we concluded substantial evidence supported a finding of implied malice where the defendant drove 70 miles per hour in a 35 mile-per-hour zone, crossed into the opposing traffic lane, caused oncoming drivers to avoid him, ran a red light, and struck a car in the intersection without any attempt to brake. (*Id*. at p. 941; see also *Fuller*, *supra*, 86 Cal.App.3d 629 [the defendant acted with implied malice where he "drove at high speeds through main thoroughfares" in an attempt to evade officers, drove on the wrong side of the road causing oncoming cars to swerve, ran a red light, drove 60 to 70 miles per hour at oncoming

5

police vehicles, and did not slow down when he ran a red light and killed another driver in an intersection].)

*Commitment to SYTF*

M.M. contends the juvenile court abused its discretion when it committed him to SYTF and found that a less restrictive alternative disposition was unsuitable. We conclude otherwise.

*1. Relevant law*

A juvenile court may order commitment to a secure facility if the following criteria are met: "(1) The juvenile is adjudicated and found to be a ward of the court based on an offense listed in subdivision (b) of Section 707 that was committed when the juvenile was 14 years of age or older. [¶] (2) The adjudication described in paragraph (1) is the most recent offense for which the juvenile has been adjudicated. [¶] (3) The court has made a finding on the record that a less restrictive, alternative disposition for the ward is unsuitable." (§ 875, subd. (a)(1)-(3).)

At issue here is the third criterion. To determine whether a less restrictive alternative disposition is unsuitable, "the court shall consider all relevant and material evidence, including the recommendations of counsel, the probation department," and each of the following criteria: "(A) The severity of the offense or offenses for which the ward has been most recently adjudicated, including the ward's role in the offense, the ward's behavior, and harm done to victims. [¶] (B) The ward's previous delinquent history, including the adequacy and success of previous attempts by the juvenile court to rehabilitate the ward. [¶] (C) Whether the programming, treatment, and education offered and provided in a secure youth treatment facility is appropriate to meet the treatment and security needs of the ward. [¶] (D) Whether the goals of rehabilitation and community safety can be met by

6

assigning the ward to an alternative, less restrictive disposition that is available to the court. [¶] (E) The ward's age, developmental maturity, mental and emotional health, sexual orientation, gender identity and expression, and any disabilities or special needs affecting the safety or suitability of committing the ward to a term of confinement in a secure youth treatment facility." (§ 875, subd. (a)(3).)

*2. Relevant procedural history*

The probation department prepared a report recommending M.M. be committed to SYTF. The report detailed M.M.'s prior delinquency history, which included five burglaries and attempted burglaries. (Pen. Code, § 459.) On the first petition, the juvenile court ordered M.M. home on probation. On the second and third petitions, M.M. was ordered to camp and was released after completion. On the last two petitions, the court granted home on probation. M.M. received two citations for petty theft and loitering while on probation and had multiple unverified school absences and "tardies." He later violated probation by failing to complete the work required to earn his high school diploma.

M.M. was on probation and had met with his probation officer earlier in the day when he led deputies on the high-speed chase that resulted in V.R.'s death. The probation reported noted that M.M. was not "amenable to rehabilitation services" at a suitable placement or camp. Because of his previous participation in rehabilitative services, the gravity of his offense, and his criminal sophistication, M.M. required a higher level of supervision. A "less restrictive alternative would lack the programming length to provide public safety and services needed to achieve the rehabilitative goals" for M.M.

7

At the disposition hearing, the probation officer who authored the probation report testified she had supervised M.M. for three years. In recommending SYTF, probation considered a variety of factors including M.M.'s previous delinquency record, participation in various services, the severity of the offense, and his eligibility for other programs. The probation officer testified camp placement would be unsuitable because the age limit is 18 years old and M.M. was two months shy of 18. She also testified that SYTF would be appropriate because it provides services such as psychiatric, counseling, and educational services that M.M. would need.

A probation director testified SYTF provided therapy and psychiatric services, vocational training, and educational services such as college courses towards an Associate in Arts (A.A.) degree. She testified that the services offered were individually tailored to meet the ward's needs. The goal was to develop services to "move along" with the individual for the time they are at SYTF.

Another probation director testified SYTF was in negotiations to offer a bachelor's level education. He testified that everyone receives a tailored educational plan designed to reach each person's goal.

Several witnesses testified on M.M.'s behalf regarding his good behavior in juvenile hall, progress in counseling, maturity, completion of high school and enrollment in college courses, and participation in various programs. A director of the Anti-Recidivism Coalition (ARC), who worked with M.M., testified that M.M. would benefit more at Magnolia House than at SYTF. He believed SYTF did not have all the "programming up and running right now." He testified that SYTF was still

8

working on "building out programs." The housing director for ARC said he had a bed available for M.M. at Magnolia House. He testified that Magnolia House is a 22-bed home geared to help 18- to 25- year-old men return to their communities. There are a variety of services available, including counseling and education services. A resident is permitted to leave Magnolia House so long as they notify staff members where they are going.

At the conclusion of the hearing, the juvenile court committed M.M. to SYTF and found that a less restrictive alternative disposition would be unsuitable. The court discussed all the criteria it considered pursuant to section 875, subdivision (a)(3).

First, regarding the severity of the offense, the court noted that M.M. was the "sole actor and the only principal." His conduct was so severe that immediately after the accident "he was plainly aware of the malicious and reckless and dangerous and callous nature of his actions."

Second, regarding previous delinquent history, the court noted that M.M.'s criminal history began when he was 15 years old, and there were five sustained petitions for felony theft offenses. M.M. had multiple probation violations. He was placed home on probation on multiple occasions and sent to camp once. However, M.M. "never successfully completed a grant of probation." The court noted that M.M.'s conduct "continues to get worse, not better" despite attempts at rehabilitation. On the date of the traffic collision, M.M. was on probation. And hours before the traffic collision, M.M. had met with his probation officer about his efforts to rehabilitate "to no avail."

Third, as to whether programming, treatment, and education offered at SYTF was appropriate for M.M. to meet his

9

treatment and security needs, the juvenile court acknowledged SYTF was a new program, and that M.M. could enroll in college level courses. Although upper level college classes were not available now, they "presumably will be available" at a later time. As to other programming, the court found there was a "limited amount of vocational training available," but intensive mental health counseling, psychiatric, substance abuse, and religious services that will be provided. The court found SYTF was "the only alternative that meets the security needs of [M.M.] and the community."

Fourth, as to whether the goals of community safety and rehabilitation could be met, the juvenile court found that neither camp nor suitable placement were appropriate for M.M., who was now 19 years old. Camp was suitable for minors 18 years or younger, and M.M. would "not fit into the camp structure." Because of the age discrepancy, the court found that M.M. "could control or be a negative influence to others." SYTF had a "range of ages," however, and the minors are housed separately by age and maturity. Thus, the court found "most of [the] concerns [with camp] can be alleviated" by SYTF's structure. Moreover, a camp commitment is capped at nine months which the court found was "not nearly enough time for [M.M.] to fully understand the impact of his actions" or receive sufficient counseling, training, or therapy.

Finally, the court noted that M.M. had previously been in camp and "it had no impact on his rehabilitation." For similar reasons, the court found suitable placement was not an appropriate alternative.

The juvenile court also found that home probation and Magnolia House were not appropriate for M.M. The court found

10

that M.M. needed "a more structured environment to help him focus on his rehabilitation, and to make sure that he consistently attends the programs that will help him." An SYTF "would provide these services and resources for a far greater period of time so that rehabilitation can be assured, and with far more intensity and accountability." Placement in a less structured environment than SYTF and releasing M.M. back into the community would risk public safety.

With respect to M.M.'s age, maturity, and other factors that could affect the safety and suitability of committing him to SYTF, the juvenile court found no "limitations or problems."

### 3. Analysis

We review the juvenile court's placement decision for an abuse of discretion. (*In re Nicole H.* (2016) 244 Cal.App.4th 1150, 1154.) The juvenile court abuses its discretion " ' "when the factual findings critical to its decision find no support in the evidence." ' " (*Ibid.*) We will not disturb the juvenile court's findings when there is substantial evidence to support them. (*In re Khalid B.* (2015) 233 Cal.App.4th 1285, 1288.) " ' " ' "In determining whether there was substantial evidence to support the commitment, we must examine the record presented at the disposition hearing in light of the purposes of the Juvenile Court Law," ' " ' " which includes public safety as well as the rehabilitation of the juvenile offender. (*Nicole H.*, at p. 1154; § 202.)

Here, the juvenile court did not abuse its discretion in finding that a less restrictive alternative disposition was unsuitable. Substantial evidence supported that each criterion weighed in favor of committing M.M. to SYTF as opposed to an unsuitable, less restrictive alternative. The evidence supports

11

that M.M.'s crime was severe—he committed murder and was the sole actor. M.M.'s prior delinquent history, his previous camp placement, and unsuccessful home probation grants supported the finding that a less restrictive alternative would not be appropriate. As the juvenile court noted, M.M. had never successfully completed probation and his offenses "continue[d] to get worse, not better" despite attempts at rehabilitation.

The evidence also supports the juvenile court's finding that SYTF met M.M.'s programming, treatment, and educational needs. Although SYTF was new, SYTF provided specifically tailored therapy, counseling, and mentoring services and M.M. could continue taking courses towards his A.A. degree. With respect to higher level courses, negotiations for these courses were underway, and the court found such courses would be available in the future. Regarding community safety and rehabilitation, the court properly concluded SYTF was "the only alternative that meets the security needs of [M.M.] and the community." Given the increasing seriousness of M.M.'s crimes and his prior failed attempts to rehabilitate in less restrictive settings, a less structured environment such as Magnolia House would not adequately protect public safety or promote the goal of rehabilitation. Moreover, camp was not a viable option because it had age limits. Because substantial evidence supports the court's findings, there was no abuse of discretion in ordering M.M. to SYTF.

DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>

BALTODANO, J.

We concur:

GILBERT, P. J.

YEGAN, J.

Brian C. Yep, Judge

Superior Court County of Los Angeles

_____

Christine M. Aros, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Gabriel Bradley, Deputy Attorneys General, for Plaintiff and Respondent.